QUIÑONES, PLAINTIFF AND APPELLEE, *v.* PÉREZ, DEFENDANT AND APPELLANT.

APPEAL from the First District Court of San Juan in an Action of Debt.

No. 2539.—Decided November 22, 1923.

EVIDENCE—NEW TRIAL.—The trial court admitted in evidence a certified copy of an opinion of the Supreme Court containing what purported to be a

literal copy of proceedings had in the year 1873, duly certified to by the clerk of the municipal court, and the appellants insisted that the certified copy of the opinion of the Supreme Court was not admissible as proof of proceedings had in 1873. *Held:* That such irregularities in practice ought not to be encouraged, and, ordinarily, successful insistence in the court below upon the admission of secondary copies, when first copies are so readily obtainable, would justify a reversal; but in the circumstances of this particular case the failure of the court below, upon admission of the document as evidence of what the Supreme Court had in fact decided, to state that it would not be considered for any other purpose, is not of itself a sufficient reason for granting a new trial.

ID.—CONCILIATION—LIMITATION OF ACTION—AGREEMENT.—The plaintiff's cause of action is based principally on a conciliation reached as the result of proceedings brought in the year 1885 and alleged to have been ratified in other proceedings in 1903. The trial court admitted in evidence a copy of the record of this conciliation proceeding and the appellants allege error in the proceeding on the ground that in accordance with article 477 of the old Law of Civil Procedure no action based on such conciliation proceeding lies unless it is brought within two years thereafter. *Held:* That said article 477 referred to proceedings in which no agreement had been reached, but is not applicable to an action to compel compliance with an obligation contracted in a conciliation proceeding in which there was an agreement.

INTEREST — COMPOUND INTEREST — LIQUIDATION. — The plaintiff's prayer for the recovery of the two thousand *pesos* with interest as agreed at the rate of 6 and 9 per cent, which the defendant admits to be just but attacks as premature, does not imply an obligation to pay compound interest where there was no valid pre-existing agreement to that effect. The amount to be paid was that found to be due by the final liquidation, and under the law governing the original contract it could not include compound interest.

The facts are stated in the opinion.

Messrs. *E. Acuña* and *Texidor & De la Haba* for the appellant.

Messrs. *J. Guzmán Benítez* and *B. Pagán* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Plaintiff obtained a judgment in the district court for the delivery within thirty days of sixteen head of cattle, together with the increase since 1911, and for the payment within ninety days of 56,025 *pesos* and 98 *centavos* or the equivalent thereof in American money, together with interest thereon at nine per cent per annum from December 1, 1915, compounded annually, until paid in full, and for costs.

There is no separate assignment of errors, but at inter-

vals, in the course of a sixty page brief, appellants submit eight specific grounds upon which they rely for a reversal.

The first contention is that the court erred in admitting as evidence a certified copy of the opinion and judgment in the case of *Pérez Villamil* v. *Román*, 19 P. R. R. 832.

The certified copy last above mentioned was offered in support of the second, third and fourth averments of the complaint, which are as follows:

"Second.—Ramón Pérez Villamil was a land owner, unmarried and a resident of Río Grande in the year 1868. The said Ramón Pérez Villamil had hired the plaintiff as cook and lived with her in concubinage, with the result that three natural children were born and later so acknowledged and declared to be his forced heirs by a judgment rendered by this district court on January 15, 1912, and affirmed on appeal by a judgment of the Supreme Court of Porto Rico on June 27, 1913. Immediately thereafter Angel, Adelina and Plácida Pérez Villamil y Quiñones sold to the defendants, the widow and lawful children of Ramón Pérez Villamil, all their rights and interests in or affecting the estate of the latter, the purchasers being subrogated to all the rights and obligations vesting in them as such acknowledged natural children.

"Third.—Due to the unlimited confidence between the plaintiff and Ramón Pérez Villamil by reason of the aforesaid relations, the former delivered to the latter by way of loan, without any receipt therefor, the sum of 10,000 *pesetas,* Spanish currency, or 2,000 *pesos* of said money, which the plaintiff had won in the drawing 'of the provincial lottery in Porto Rico held on June 23, 1868, when the ticket No. 3081 and one belonging to her were awarded a prize, and said loan was made subject to the condition that the 2,000 *pesos* should bear interest at six per cent per annum, no date having been fixed for the maturity of this loan because the plaintiff did not think it necessary and inasmuch as they were living in concubinage under the same roof, and because Pérez Villamil was supporting Angel, Adelina and Plácida, their issue.

"Fourth.—In the same year 1868 the plaintiff had acquired with the money she had put aside from the proceeds of her labor three cows with calf and a mare with foal, which she turned over to Ramón Pérez Villamil to keep for her on an equal shares basis, to which end he placed the cattle on a property purchased for that purpose."

What purports to be a verbatim copy of the record of a proceeding had in November, 1873, duly certified by the secretary of the municipal court, was embodied in the opinion of this court offered as evidence in support of the foregoing averments, and already referred to as reported at page 832 of vol. 19 of the Porto Rico Reports. It is of no importance in the instant case save in so far as it may aid in an understanding of the questions now raised by appellants or serve to indicate in a general way the earlier events leading up to the later developments which constitute the real basis of the present controversy.

Appellants insist that the certified copy issued by the secretary of this court was not admissible as evidence of the proceedings had in 1873 before the Justice of the Peace of Río Grande. For the purposes of this opinion the soundness of this view as an abstract, technical statement of the Law of Evidence may be conceded. But the copy was clearly admissible to show the result of the former suit, if material to the issues involved herein, and no question has been raised in this regard. The judgment of this court simply affirmed the judgment appealed from, and the opinion was pertinent both for purposes of identification of the judgment so referred to and for the purpose of showing the exact nature and scope of the questions decided.

The original cause of action, as disclosed by the proceeding in 1873, was later merged into a compromise agreement consummated in 1885; and for the purposes of the instant case, the earlier incident was a negligible factor, except as already indicated by way of explanatory inducement to subsequent events.

The only prejudice even remotely suggested in the brief is that by the admission of this copy defendants were deprived of the opportunity of "comparing the document in question, and of making objections thereto." But appellant does not explain, nor do we perceive, how any better opportunity for

comparison would have been afforded by tender of a first copy certified by the secretary of the municipal court instead of the same document embodied in the opinion of this court. So, also, if defendants mean that they were deprived of an opportunity to examine the original record, that objection would apply equally to the admission of a first copy certified by the legal custodian of such original and is obviously untenable.

In any event, the opinion of this court shows that the original record from the Río Grande court, as well as a duly certified copy thereof, had been brought up with the record for a comparison of signatures asserted by defendants to be forgeries, and was found by this court, as well as by the court below, to be genuine. Thus, in the case at bar the original was not only readily accessible to all parties concerned, but defendants themselves were intimately acquainted with every detail thereof and presumably quite prepared to detect any material variance or discrepancy between such original and the copy thereof contained in the opinion admitted in evidence by the trial judge.

Such irregularities in the practice ought not to be encouraged, and, ordinarily, successful insistence in the court below upon the admission of secondary copies, when first copies are so readily obtainable, would justify a reversal. In the circumstances of this particular case, however, we are persuaded that the failure of the court below, upon admission of the document as evidence of what was actually adjudged and determined by this court, to state that it would not be considered for any other purpose, is not, without more, a sufficient reason for ordering a new trial.

Plaintiff's present cause of action, as already stated, is based primarily upon a compromise agreement reached as the result of judicial proceedings instituted in 1885 and alleged to have been ratified in the course of another proceeding in 1903.

The court below deemed the record of this compromise agreement of such importance that it was inserted in full and discussed at some length in an elaborate and well written opinion. A closer acquaintance with that record than would result from a statement of its general tenor and effect may contribute to a better understanding of the true bearing of the questions sought to be raised by appellants and thus simplify our own discussion and disposition of these matters. It follows:

"In the town of Río Grande this 25th day of April, 1885, before Acting Judge Timoteo González—the regular judge being legally disqualified because he was the nephew of the defendant—appeared of the one part as plaintiff Telesfora Quiñones, of age, single, resident and engaged in domestic duties, together with her mediator, José Quiñones Correa, and of the other part Ramón Pérez Villamil, also a resident, merchant, unmarried and of age, accompanied by his mediator or adviser, Abelardo Rivera y Correa, and after the parties had produced their respective certificates of identification, which were returned to them, the plaintiff stated: That she reestablishes her complaint to recover from defendant Ramón Pérez Villamil the monthly instalments of $10 corresponding to the months of January, February and March that he was under obligation to pay her for the support of their children Angel, Adelina and Plácida, by virtue of a judgment rendered in an action brought by the plaintiff against the defendant on November 4, 1873, in the justice-of-the-peace court of this town before Judge Santos Jiménez. That besides the amount sought to be recovered plaintiff further claims five cows and a mare together with one-half of the profits derived therefrom to date, as well as the payment of 2,000 *pesos,* Spanish money, with interest at 6% per annum, which the defendant herein agreed to pay her as and from July 1, 1868, when he received the amount, and deems it unnecessary to make any further observations. The defendant answered that in compliance with the judgment rendered in the suit to which the plaintiff refers, he has been contributing to the support of his children by furnishing the plaintiff $10 monthly, three changes of clothes quarterly and the necessary footwear; but that as they are now of age, married and with children, and hence emancipated and beyond his paternal jurisdiction, he deemed it but right to stop payment of the said monthly instalments pending an

order of the court.—That as to the cattle and money to which the plaintiff refers, his personal dignity and the position he has held and holds in the community requires him to explain the matter in certain detail so that the judge and other persons present may have a correct idea of his conduct.—The plaintiff Telesfora Quiñones lived at his home as housekeeper for many years.—With her hoardings she was able to purchase at different times five cows and a mare, with their young, which were turned over on a profit basis to small land owners, who ultimately rendered false accounts. In the year 1869 the witness purchased from Father Valajuly 226 cuerdas of timber land and as up to a certain point he was and is obliged to protect not only the interests of the plaintiff but also her health and comfort, if only in consideration of the many attentions and kind regard shown him during the long years she acted as his housekeeper, the first thing he did was to take the animals on a share and share alike basis and pasture them on his property.—The sale, exchange and other transactions subsequently effected are shown in a special note-book, which he kept exclusively for that purpose among his other books, marked No. 2, so as not to mix the plaintiff's account with that of other persons with whom he is doing business. As to the sum of two thousand pesos, this was the amount awarded ticket No. 3081 purchased by the plaintiff in the Island lottery at the drawing held June 23, 1868, from which date the affiant has located the amount at 6 per cent interest per annum and it thus appears in a private document which was delivered to the plaintiff by the defendant in the year 1872, if he remembers correctly, and should be in her possession. I state finally that at the trial held on November 4, 1873, then as now plaintiff sought to recover the cattle and the value of the lottery ticket with interest, and the defendant refused to accede, then as now, because he knows that, if he did, the generous tendencies of the plaintiff and her extreme fondness for her elder son Angel, a youth of vicious habits, a follower of women and an inveterate gambler who knows how to influence the plaintiff and bend her to his caprice, would result in the squandering of that little capital, and the witness, under renewed obligations as he is to watch out for the health and comfort of his good old housekeeper, has always avoided and will always avoid by all means possible the squandering by their said son of the property of the plaintiff, which, however annoying this may be to the son and those who surround her, the witness will continue to increase so that when she reaches an age that will not permit of her working she may live in comfort

upon her income and finally leave what remains to her children as
is the duty of all good mothers; and that this is all witness has to
say regarding the matter of the ticket referred to in the complaint
which Telesfora Quiñones has filed against him. At this stage the
judge exhorted the interveners to do everything in their power to
the end that the parties might reach an understanding and avoid
vexatious litigation, and after mutual observations the plaintiff
stated: That, influenced not only by her love for the defendant—
father of her three children Angel, Avelina and Plácida—but also
by the reasons set forth by her adviser, Quiñones Correa, and other
persons intervening in this proceeding, she agreed, of course, that
the defendant should continue to advance her small capital to her
in the same manner as heretofore and for a period that the defend-
ant might deem suitable to both but subject to the condition that
on the last day of the present month he shall make a statement of
the balance of the interest due so as to add the same to the 2,000
*pesos* principal; and on the resultant aggregate total interest shall
be computed from the first of the following month until the date of
general settlement or maturity to be fixed by Villamil, compounded
annually. And the defendant alleges: That he agrees with the
statements made by the plaintiff Telesfora Quiñones and will make
the settlement, compound the interest and make payments on the
basis or at the rate of nine per cent per annum from the first day
of May of the following year. And for the general settlement of
account, both of the cattle and horses as well as of the 2,000 *pesos,*
Spanish money, and interest in like specie, he specifies as the date
therefor a date preceding by two months his departure for Spain,
his native land, where, under medical advice, he will soon retire for
good because of an ailment of the stomach from which he has been
unable to find relief. And since it is reasonable and logical that
he should duly notify the plaintiff of that day, he binds himself
so to do to the end that she, in company with a proper person and
a notary of her choice, may present herself at the place to be in-
dicated for the purpose to the end of effecting a general settlement
of everything and delivery of the balance in favor of the plaintiff,
subject to the execution of a deed of acquittance by the latter im-
mediately upon receipt of the amount. And the plaintiff agreeing
with the propositions of the defendant, the pact was ratified in all
its parts. Wherefore the judge concluded the proceeding, ordering
that certificates be issued to the party asking therefor and directing

the defendant to return the paper unused and to pay the costs of this trial.—The foregoing having been read and the parties agreeing therewith, affixing their signatures tho'se who know how to write, together with the judge and the interveners, before me. I attest.— (sd.) Timoteo González.

"The signatures follow:

(sd.) R. Villamil.                     (sd.) José Quiñones.
(sd.) Abelardo Rivera.                 (sd.) Juan R. Casanovas.

"Return. On April 25 of the present year, I attach to the record three sheets of paper unused, of 20c. each, series 0004568, 000.4569 and 0004605. 1 attest.—(sd.) Casanovas.

"Another. On the same date I issue a certified copy of this proceeding to the defendant Ramón Pérez Villamil. I attest.—(sd.) Casanovas.

"I, Teodosio F. Pereira, Secretary of the Municipal Court of Carolina, P. R.,

"CERTIFY that the foregoing is a true and faithful copy of its original on file in this office, to which I refer. And for the purpose of delivery to Carlon Quiñones, resident of Río Grande, I issue and sign the same in Carolina, P. R., this 11th day of Septemoer, 1915.— (sd.) Teodosio F. Pereira, Secretary of the Municipal Court."

Appellants say that the court erred in admitting a copy of this record. They insist that under section 477 of the former Code of Civil Procedure no action would lie upon such a compromise agreement unless brought within two years thereafter, and, therefore, in the absence of any showing as to compliance with this requirement, the documentary evidence of the agreement in question was inadmissible.

But the clause relied upon must be construed in connection with its context, both in the same section and in others contained in the subdivision entitled "Provisions to avoid litigation." Articles 459, in so far as pertinent, 461 and 475 to 478, inclusive, read as follows:

"Art. 459.—Before instituting a declaratory action a conciliation must be attempted before the competent municipal judge.

"The following are excepted:

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"6. Declaratory action instituted to annul or to demand the fulfillment of agreements made in proceedings to secure a conciliation."

"Art. 475.—The agreement reached by the parties at a proceeding to secure a conciliation shall be enforced by the same municipal judge, according to the procedure prescribed for the execution of judgments rendered in verbal actions, when the interest involved does not exceed 1,000 pesetas.

"Whenever the amount involved exceeds the sum above mentioned it shall have the validity and force of an agreement contained in a formal and public instrument.

"Art. 476.—An action for annulment of the agreement entered into at proceedings to secure a conciliation may be brought for the causes which invalidate contracts.

"The complaint in said action must be presented to the judge of first instance of the judicial district within the eight days following the proceedings to secure a conciliation, and it shall be heard and determined according to the procedure prescribed for declaratory actions, based upon their import.

"If the amount involved should not exceed 1,000 pesetas, the action shall also be heard before the judge of first instance, according to the procedure prescribed for oral actions, and without further remedy.

"Art. 477.—If the ordinary action is not instituted within two years following the proceedings to secure a conciliation, the latter proceeding shall not produce any effect whatsoever, and new proceedings must be held before instituting the action.

"Art. 478.—Neither shall the prescription be interrupted if the proper action be not instituted within the two months following the unsuccessful proceedings to secure a conciliation."

The ordinary action referred to in article 477 is the "Declaratory action" mentioned in section 459, which by the express provision of subdivision 6,' is not the action instituted to annul or to demand the fulfillment of "agreements made in proceedings to secure a conciliation." .If an agreement was reached, the purpose of the preliminary proceeding had been accomplished. The necessity for instituting the contemplated ordinary action had been avoided. This origi-

nal cause of action was merged in the new agreement. Where small amounts were involved, this new obligation was enforced by the simple process of issuing an execution thereon as though it were a judgment. If for more than the specified amount, suit might be brought thereon as upon any contract announced by a public instrument. In neither case was a second preliminary proceeding, with a view to compromise, required; but if no agreement was reached and the contemplated ordinary action was not brought within two years, then the prospective defendant was entitled to another opportunity to compromise.

Articles 477 and 478 both referred to proceedings in which no agreement had been reached. The effect of the proceeding, which was lost if the ordinary action was not instituted within two years, was its effect as a fulfillment of the statutory prerequisite to such action, to wit, an unsuccessful attempt at compromise. The statement that the failure to institute the ordinary action within two years after the invitation to compromise shall rob that proceeding of "any effect whatsoever" is coupled conjunctively with the further provision that, in such event, "new proceedings must be held before instituting the action." But, as already pointed out, no such proceedings are necessary as a prerequisite to the enforcement of the compromise agreement after consummation thereof. Nor does section 477 speak at all of a consummated agreement or compromise and settlement, or of its effects. That article refers only to the proceedings instituted with a view to such compromise and the ineffectiveness of such proceedings when unsuccessful and not followed within two years by the ordinary action contemplated by article 459.

A half-dozen or more words cannot be torn from their setting and when thus isolated given a literal meaning utterly inconsistent with both the spirit and the letter of

every other clause and provision in the same paragraph and
subdivision of the Code.

The third assignment is that the court erred in admitting
documentary evidence of a similar proceeding of March 9,
1903. The theory is, in addition to the matters already dis-
cussed, that General Order No. 118 of August 15, 1899,
reorganizing the judiciary, providing for municipal courts
composed of three judges, modifying to some extent the
former procedure and repealing all provisions inconsistent
with the terms of such order, abolished the practice of pre-
liminary proceedings to effect an amicable adjustment. The
conclusion is that the proceedings of 1903 was an absolute
nullity, first, because not authorized by the law of procedure
then in force and, second, because a single municipal judge
presided instead of the three members required to constitute
a court.

Appellants quote from the General Order in question the
first half of section 24, but omit the final clause thereof.
That section reads (italics ours):

"There shall be a municipal court in each municipal district.
Each municipal court shall consist of one judge and two associate
judges, who shall jointly *decide* and sign all the cases that have been
properly brought before the court *and determined by the same.*"

Again, the brief refers in general terms to sections 66 to
73 as continuing in force the former Code of Procedure,
and asserts that there is no provision for the preliminary
proceeding. The first sentence in section 72 reads thus:

"All *steps,* exceptions, and proofs in the various classes of suits
shall be such as required by the law of civil procedure and according
to whether the suit be declarative, liquidated claim, injunction, evic-
tion, or of other character."

And appellant says:

"It is to be noted that in the old procedure the act of conciliation,
so far as the ordinary action was concerned, was so essential in its
nature that a failure to attempt its consummation constituted a serious

ground of objection in connection with the case, which could not be brought unless such conciliation was attempted or consummated. It was, therefore, a form of procedure, and different from those established by General Order No. 118. In the circumstances there is no doubt that the repealing provision of section 74, General Order No. 118, applied to the said act.''

Section 74, however, is followed by section 75. The two should be read together and are as follows:

"74. All provisions of the laws of civil and criminal procedure referring concretely and specially to forms or manners of procedure different or contrary to the prescriptions of this order are abrogated.

"75. Verbal suits and proceedings before municipal courts both in civil and criminal matters shall retain the same form as the present law orders.''

The brief for appellant contains no more definite indication as to wherein the features of the former procedure, now claimed to have been abolished by General Order No. 118, were in any wise "different or contrary to" the provisions of that Order. Appellant assumes, rather than undertakes to show, that the General Order had the effect attributed to it. But even if this were established, the burden would remain upon appellant to show that either the alleged unauthorized procedure, or the want of jurisdiction, necessarily vitiated the agreement actually reached. An excellent starting point for research along these lines was plainly indicated in the previous opinion of this court, *supra*. The direct bearing of what was said at that time, upon the broad hiatus that lies between the premise and conclusion involved in the argument for appellants herein, seems to have escaped the attention of counsel.

The only logical significance of the proceedings of 1903 is in connection with the alleged ratification of the obligation to pay compound interest assumed in 1885, and in the view we take of that matter, as will later appear, the error, if any, in admitting the evidence of the later proceeding, becomes harmless.

The fourth proposition submitted by appellant is that the court erred in weighing the evidence as a whole and in not finding that the proceeding of April 25, 1885, was never had in fact, and that the original record thereof was fictitious. A discussion in detail of the merits of the question here raised would serve no useful purpose. We find no such manifest error as to require a reversal.

The fifth assignment is that the court erred in giving effect to the proceedings last above named as operating to interrupt the running of the statutory period of prescription. The court below did not attribute to that proceeding the effect referred to. But if it had, the questions here sought to be raised are in substance the same as those already discussed and disposed of in connection with the second assignment.

Next, appellants insist that the court below erred in holding the obligation assumed in the agreement of compromise reached on April 25, 1885, if any (and if the same had any legal effect after the lapse of two years without suit thereon), to be without term.

What the court said about the nature and term of the obligation contained in the agreement of 1885 was this:

"We have already seen that in the act of conciliation of April 25, 1885, Ramón Pérez Villamil set a day for the fulfillment of his obligation, namely, two months prior to his final return to Spain, to the end that at such time Telesfora Quiñones might appear accompanied by a capacitated person and a notary of her choosing at a place which the debtor himself would indicate for the purpose of mutually preparing a general settlement of everything and delivering the amount resulting in favor of the plaintiff, the plaintiff giving a deed of acquittance upon receipt of the money. As will be seen, the duty to pay the interest on the principal lent and to liquidate the cattle account, delivering the resultant balance to the plaintiff, was manifest, definite and unalloyed. Its fulfillment alone depended upon the future and certain final return of Ramón Pérez Villamil to Spain, since his health, according to medical advice, made his return necessary."

From the brief for appellants we take the following extract:

"Evidently the settlement in question falls within the three following stipulations:

"(*a*) Agreement to continue Villamil's management until he made his trip to Spain for the sake of his health and for which trip he had therefore made preparations.

"(*b*) Agreement to pay from May 1, 1885, to the end of his administration, the interest of nine per cent compounded annually.

"(*c*) Agreement to effect a general settlement of accounts, Villamil to pay the amount shown to be due, within the two months preceding his trip to Spain, of which he was to give opportune notice.

"But it is none the less true that as a result of Telesfora Quiñones' own voluntary request, the said three agreements were subject to the performance of another act distinct from the objects involved in the said agreements and necessary for the realization of the said settlement, namely, a precise determination and liquidation of the interest that up to that time Villamil owed on account of the loan, which, upon being added to the principal, would enable the plaintiff to know positively just what she owned and at the same time enable the defendant likewise to know beyond doubt exactly how much he owed.

"That is why such settlement is necessary and assumes the force and scope of a condition, which, together with the first and principal of said agreements, that is, the one referring to the duration of the management, clearly shows that it is a necessary and essential element of the contract and as such the guiding principle of the meeting of minds of both contractors in the settlement to be effected.

"It does not seem necessary to state that the liquidation of interest forming the condition to which we refer is not and should not be mistaken for the general liquidation of the whole business.

"The former was to be accomplished on April 30, 1885, with the definite purpose of being able to count from the 1st of May following all interest due up to the said day and from then on recover the new rate of interest agreed on at nine per cent per annum. That liquidation refers exclusively to the principal advanced. The general liquidation, on the other hand, should cover the loan and cattle account and be effected as the closing operation of the management within the two months preceding the trip of Villamil.

"There is no ground for confusion, then, between one and the other, notwithstanding that both have the form and name of liquidations."

In an argument covering some fifteen typewritten pages appellants insist that immediately upon the failure of Villamil to liquidate the older accounts within five days after his promise to perform that duty, all other obligations assumed by him in the compromise agreement of 1885 ceased to exist.

It is conceivable that an illiterate woman, placed in the position occupied by Telesfora Quiñones from the time she was fifteen years of age, touched by the subtle appeal to her vanity concealed in the compliments paid to her goodness of soul and intensity of maternal affection and "prompted not only by her love for defendant, the father of her three children . . . but also by the considerations suggested by her friendly adviser, Quiñones Correa, and other persons participating in the proceedings,"—might have been induced to agree that Villamil, in addition to the option of fixing the date upon which he would carry out his solemn agreement and promise to pay, might also elect to release himself entirely from such primary obligation by the simple process of neglecting to perform a perfunctory act of little or no importance to either of the parties, and least of all to plaintiff. But it does not seem probable that an "hombre bueno" with sufficient intelligence to demand as a counterpoise to the continued administration of plaintiff's property by Villamil "until such time as he might deem desirable for both," an increase in the previous rate of interest, would have deliberately assented to any such illusory proposition. Nor do we find in the record of the proceeding any very persuasive evidence of such an intention. That record speaks for itself and no analysis thereof in detail seems necessary to sustain our conclusion in this regard. We are

content to quote an extract from Scaevola as contained in the brief for appellee:

"In other respects the most important feature of a condition, that which really imparts to it its character as such and distinguishes it from all other juridical properties or incidental manifestations of a contract, is the dependency of the right or duty, in its essential character, upon the event designated as the effect. Not everything to which a right or duty is subordinate constitutes a condition, for, if in the mind of the parties the fact in controversy may be substituted in any way, or, let us say, eliminated, without affecting the initial object, it will embrace some element of more or less value, which should generally be procured, but which does not vitally affect the existence of the main obligation. If Peter agreed to pay Antonio an undetermined amount and Mariano was appointed to make the payment and died before doing so, the duty would not thereupon cease to exist, whatever the new form of procedure might be in the matter of payment. Distinction must be made between what is essential and what is contingent, between the essence and the form; between what is necessary and what is contingent, and only that which must imperatively, necessarily and unalterably be effected to carry out the idea of the contracting parties, classified as a condition."

It did not occur to Villamil in 1903 to plead an unfulfilled condition precedent. The construction placed by him at that time upon his own agreement and acquiesced in by plaintiff, was the construction adopted by the court below and now complained of as prejudicial error. The record, as a whole, leaves no room for doubt as to what the attitude of Villamil would have been if plaintiff in May, 1885, had elected to treat the compromise agreement as null and void, to regard the parties as relegated to their previous *status quo* and to demand the immediate return of her money and cattle upon the theory of an unfulfilled condition precedent.

That is a new theory evolved as a last resort under pressure of the present situation. The basic proposition upon which it rests was never in the mind of the contracting parties. A contrary conclusion would involve the hypothesis

that plaintiff's friendly adviser in 1885 was either dishonest or else mentally disqualified.

Another contention is that the court erred in not holding that the action was barred and in not ruling that the alleged proceeding in 1903 did not interrupt the running of the period prescribed by law. Here also the theory is that plaintiff's cause of action accrued in 1885 by non-fulfillment of the alleged condition precedent, and the argument is practically a repetition of that under the second and sixth assignments:

The eighth assignment reads as follows:

"The court erred in violating section 7 of the Act of March 14, 1856, relating to interest, by holding that the agreement for the compounding of interest during the term of the contract embodying the act of conciliation of April 25, 1885, was lawful and effective; and as a consequence of such mistake the court likewise erred in estimating at 56,025 *pesos* and 98 *centavos,* Spanish currency, the amount claimed to be due on November 30, 1915, by the compounding of interest at the rate of 9% per annum from March 1, 1885, to November 30, 1915; and likewise erred in directing the defendants to pay the aforesaid amount or the equivalent thereof in American currency, together with interest thereon at 9% per annum, compounded each year, from December 1, 1915, until the discharge of the debt in full."

The position here taken by appellant is well sustained both by the earlier Spanish precedents and by the doctrine of the American courts. Judgments of the Supreme Court of Spain of October 28, 1871; January 18, 1873; May 4, 1874; December 16, 1887; June 28, 1897. Decision of the Directorate of Registries of May 3, 1884. 15 R. C. L. 36.

Since the adoption of the Civil Code, however, the Supreme Court of Spain has shown a disposition to sustain the validity of agreements to pay compound interest. Judgments of the Supreme Court of Spain of February 6, 1906, and October 15, 1902. Decision of the Directorate of Registries of October 16, 1903.

These more recent adjudications are based upon certain sections of the Civil Code and especially upon section 1109 corresponding to our section 1076, which reads as follows:

"Sec. 1076.—Interest due shall earn legal interest from the time it is judicially demanded, even if the obligation should have been silent on this point.

"In commercial transactions the provisions of the Code of Commerce shall be observed.

"Saving banks shall be governed by their special regulations."

The *ratio decidendi* seems to be that the words "even if the obligation should have been silent upon this point" construed in connection with other provisions in regard to the liberty of contract imply that the parties may stipulate in advance for the payment of compound interest.

With us, of course, repeals by implication are not favored, and this seems to be a somewhat slender thread upon which to hang so weighty a conclusion. Also, of course, these decisions rendered by the Supreme Court of Spain since the change of sovereignty are not binding upon this court, but we are at liberty to interpret, and do interpret, our own laws according to our own rules of statutory construction. Moreover, where questions of public policy are involved we are especially prone to follow the general principles announced by our own courts.

In the view that we take of the instant case, however, we need not decide this very interesting question, which is worthy of more serious consideration than we are permitted to bestow upon it at this time. The agreement to pay compound interest was unquestionably void in 1885, when it was made, nor can we agree with counsel for plaintiff that it was ratified by Villamil in 1903. The record of the proceedings of 1903, in so far as pertinent to this question, reads as follows:

"Under leave of the judge the plaintiff, through her friendly adviser, stated that she reproduces her complaint and prays for an

order directing the defendant to deliver to her the cattle and horses, together with one-half of the profits to date, as well as the 2,000 *pesos,* Spanish currency, that he has owed her since the year 1868, with interest at the rate of 6% and 9% a year, since, despite, the various demands made by her on the defendant, both personally as well as through various friends, she has been unable to obtain what was due and has thus been reluctantly compelled to bring this action.—The defendant stated that he has never denied that he received from the plaintiff and in the manner described the property to which the said Telesfora Quiñones refers, and that he so stated in an action that was brought in the justice of the peace court of this town on November 4, 1873, before Judge Santos Jimenez, as well as in another proceeding of conciliation also between the parties and held on the twenty-fifth of April, 1885, before the substitute municipal judge, Hon. Timoteo González, and since it was clearly and precisely stated at this trial when the affiant should balance the outstanding accounts due the plaintiff and deliver the amount to her, he is not prepared to comply with her desires at this time unless so ordered by a court, since otherwise he would be violating the stipulation made at the said trial. Therefore affiant does not see how he can prevent plaintiff from taking any steps she pleases. And no arrangement having been reached by the parties and their friendly advisers having been unable to come to any agreement, although anxious so to do, the court adjourned the proceeding. . . . . ''

Perhaps in 1903 the parties might have made a new and independent contract for the payment of compound interest on instalments accrued up to that time. But it seems rather doubtful, to say the least, whether a mere ratification of the previous illegal agreement, however clearly intended or expressed, could be permitted to stand.

"Whatever may be the law as to cases involving no question of illegality, it is very clear that the general rule as to the effect of a compromise can have no application where the claim involved therein was wholly based upon an unlawful, as distinguished from a merely insufficient, consideration. This universally acknowledged rule is not based upon any consideration for the party against whom the relief is sought, and who will be benefited by the refusal of the court to grant the same, but upon considerations of sound public policy. Any contract executed in consideration of a previous illegal one, or in com-

promise of differences growing out of it, is, generally speaking, like that whereon it rests, illegal and incapable of being enforced." 5 Ruling Case Law, p. 884, sec. 8.

But, however this may be, section 1716 of our Civil Code expressly provides that:

"A compromise shall only include the objects specifically determined therein or which from a necessary inference from its words must be considered as included therein.

"A general renunciation of rights shall be understood as including only those relating to the question with regard to which the compromise has been made."

The language just quoted is too plain to admit of construction or to require the citation of cases in which the rule thus prescribed has been applied. We quote in passing, however, the following brief reference to a simliar provision by the Supreme Court of the Philippines in *Ferrer* v. *Ignacio*, 39 Philippine Reports, 446, at page 453:

"We have reached this conclusion, taking into account the fact that the case treats of a compromise agreement whereby the plaintiff and the defendants have put an end to a litigation, and that this class of contracts is to be strictly interpreted, and must be understood as including only matters specifically determined therein or which by necessary inference from its wording must be deemed included (Art. 1815, Civil Code)."

The result of the proceeding of 1903, in so far as any meeting of minds can be found therein, was a compromise agreement based upon the previous proceedings of 1885 and its result. Whatever ratification of the former undertaking is contained in the later record is a compromise agreement, or it is nothing.

But, even otherwise, we find nothing in the statement made by Villamil in 1903 that amounts to a ratification of the former promise to pay compound interest.

He said that he had never denied having received from

plaintiff "in the manner alleged by her" the property in question; but the manner in which plaintiff alleged the property to have been received did not include any mention of compound interest. Even plaintiff's demand for the return of the two thousand *pesos* "together with the agreed interest thereon at the rate of six and nine per cent per annum" does not necessarily imply an obligation to pay compound interest, for the simple reason that there was no such valid existing obligation. In the eye of the law there was no agreement in this regard. Nor can the insistence by Villamil upon the previous stipulation as to the time and manner in which defendant would liquidate the pending account and deliver the amount thereof (*entregar su importe*) be distorted into an implied promise to pay compound interest. The "amount" to be paid was such sum as might be found to be due as the result of the final liquidation referred to; and, under the law governing the original contract, could not have included compound interest. By no reasonable construction can the language used by Villamil in 1903 be extended to include the ratification of his previous promise to pay compound interest, which he must have known from the beginning could not be enforced against him whatever his original intention as to an optional future performance may have been.

The judgment appealed from must be modified to conform to the conclusion reached herein with reference to the eighth assignment, and, as modified,

*Affirmed.*

Chief Justice Del Toro and Justices Wolf and Aldrey concurred.

Mr. Justice Franco Soto took no part in the decision of this case.